UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK



FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D. N.Y.
★ JUN 20 2008 ★
BROOKLYN OFFICE

--------------------------------------------------------x

ANTHONY MALAVE,

        Petitioner,

    -against-

JOSEPH SMITH, Superintendent of
Shawangunk Correctional Facility,

        Respondent.

--------------------------------------------------------x

**MEMORANDUM AND ORDER**
Case No. 04-CV-0074 (FB)

*Appearances:*

*For the Petitioner:*
PETER MARKOWITZ, ESQ.
Hofstra Law Clinic
108 Hofstra University
Hempstead, NY 11549

*For the Respondent:*
ANDREW CUOMO, ESQ.
Attorney General of the State of New York
By: ALYSON JOY GILL, ESQ.
Assistant Attorney General
120 Broadway, 22nd Floor
New York, NY 10271

**BLOCK, Senior District Judge:**

    Anthony Malavé ("Malavé") is currently in custody pursuant to a judgment of the New York Supreme Court, Queens County. Pursuant to 28 U.S.C. § 2254, he petitions for a writ of *habeas corpus*.

    Although Malavé has raised an assortment of claims, his central claim is that his trial counsel provided ineffective assistance by abandoning a motion to suppress an allegedly involuntary statement; the Court appointed counsel and conducted a hearing on that claim.

    Despite *habeas* counsel's admirable performance, the Court concludes that although trial counsel's abandonment of the suppression motion fell below an objective standard of reasonable representation, it did not result in any prejudice because Malavé

has failed to sustain his burden of proving a reasonable probability that the statement was involuntary and, therefore, subject to suppression. Malavé's other claims are without merit. Accordingly, the petition is denied.

## I.

The following factual and procedural background is taken from the state-court record, as supplemented by the *habeas* hearing.

## A. State-Court Proceedings

### 1. Trial Proceedings

Malavé was charged with burglary, possession of stolen property, petit larceny and criminal mischief. All charges stemmed from a break-in at the apartment of Malavé's landlords, Nazeem and Jerry Lackhan.

At trial, the prosecutor elicited testimony from the Lackhans, Officer Angelo Agro and Nancy Gonzalez – Malavé's former boss at Big City Bagel. Malavé testified in his own defense. Through those witnesses, the following relevant facts were established:

Malavé lived in the Lackhans' building from August 1998 until January 1999. Mrs. Lackhan testified that when Malavé moved in, he told her his name was "Anthony Malone." According to Malavé, he and Mrs. Lackhan had a "one-time fling" in December 1998. Tr. at 650.[1]

On January 10, 1999, the Lackhans returned home between 8:00 and 9:00 p.m.; they found their apartment in disarray, and a camcorder and some jewelry missing. The Lackhans called 911 and reported that a burglar had entered through a second-story

---

[1]"Tr." refers to the trial transcript.

window. Mrs. Lackhan testified that she later discovered that the lock to the apartment door was broken.

Kevin O'Hea, the officer who responded to the 911 call, did not testify; however, Officer Agro, who had investigated the crime scene, testified that he did not find any fingerprints or other significant physical evidence, and that the apartment door showed no signs of forced entry.

Two days after reporting the burglary, Mrs. Lackhan went into Malavé's apartment to check the radiator. She stepped on an object and discovered that it was one of her missing earrings. She then opened Malavé's nightstand drawer and found her husband's watch.

Later that day, the Lackhans asked Malavé about the items found in his apartment; Malavé listened and then ran out of the building. When he returned that night, the Lackhans again confronted him, asking him why he broke into their apartment. According to Malavé, he denied breaking in or stealing anything, at which point Mr. Lackhan – who was standing with his hand behind his back – said, "[Y]es, you did, mother fucker, because we found our stuff in your room and if you don't tell me, I'm going to blow your fucking head off." Tr. at 586. According to the Lackhans, Mr. Lackhan never made such a threat; Mrs. Lackhan further testified that when she asked Malavé why he had broken in, he said, "I will bring your stuff back tomorrow at twelve o'clock." Tr. at 405.

The next day, Malavé was reprimanded at work for trying to sell jewelry to a co-worker; Malavé claimed that the jewelry came from a costume jewelry outlet next door to his workplace. He quit his job the same day, telling his boss he had to move because

3

there had been a fire in his home.

Malavé testified that he returned to his apartment a few days later, retrieved some of his belongings, and left with no intention of coming back. He was eventually discovered in California and was returned to New York on a fugitive warrant.

One week before trial, Malavé's appointed trial counsel, Mitchell R. Miller ("Miller"), moved, pursuant to New York Criminal Procedure Law § 60.45, for a hearing to determine whether Malavé's statement that he would return the Lackhans' property was voluntary in light of Mr. Lackhan's threat to "blow [Malavé's] fucking head off." Under § 60.45, "[e]vidence of a written or oral confession, admission, or other statement made by a defendant with respect to his participation or lack of participation in the offense charged, may not be received in evidence against him in a criminal proceeding if such statement was involuntarily made." Unlike the analogous federal constitutional protection – which bars only statements coerced by state actors, *see Colorado v. Connelly*, 479 U.S. 157, 166 (1986) ("The most outrageous behavior by a private party seeking to secure evidence against a defendant does not make that evidence inadmissible under the Due Process Clause.") – § 60.45 does not distinguish between statements made to law enforcement and statements made to private citizens.

The next day, Miller withdrew the suppression motion, and instead moved to preclude the statement on the ground that the prosecutor had failed to comply with New York Criminal Procedure Law § 710.30, which requires notice to the defendant "[w]henever the people intend to offer at a trial . . . evidence of a statement made by a defendant to a public servant, which statement if involuntarily made would render the

4

evidence thereof suppressible[.]" The trial court ruled that § 710.30 was inapplicable because the statement at issue was not made to a "public servant"; Miller did not pursue the matter further.

At the charge conference, Miller requested a missing-witness charge as to Officer O'Hea; the request was denied on the ground that it was untimely. Miller also requested a charge concerning the voluntariness of Malavé's statement that he would return the Lackhans' property; that request was granted.

Malavé's statement to the Lackhans was a focus of the parties' summations. Malavé's trial counsel told the jury,

> [Y]ou are going to be reminded, I am sure, that Mr. Malavé said I'll get your stuff back, I'll get it back. Ask yourself what you would have done when someone said, give us our stuff back or I'll blow your 'M F' head off. Especially if you are sitting there thinking that the person saying it just found out something about you and their [sic] spouse.

Tr. at 708. The prosecutor, in turn, argued that

> there's only one logical and plausible way that Mrs. Lackhan's earring and Mr. Lackhan's watch got into the defendant's room: Because on January 10th he took those items out of their apartment and put them in his room. Did he mean to leave them there? I don't know, but he did. And when he was asked about it, did he get afraid? Yeah, he got afraid because he knew he had been caught. And that's why he said he would return their possessions the next day.

Tr. at 721.

A jury found Malavé guilty on all charges. On January 7, 2000, the court sentenced Malavé, a mandatory persistent felony offender, to 20 years to life on the burglary charge and concurrent terms of one year each on the remaining charges.

*2. Post-Trial Proceedings*

    Malavé appealed to the Appellate Division, Second Department ("Appellate Division"), and argued, through counsel, that the trial court (1) deprived him of due process by allowing, under *People v. Sandoval*, 34 N.Y.2d 371 (1974), inquiry into the facts of one of his prior convictions; (2) deprived him of a fair trial by failing to charge the jury on circumstantial evidence; and (3) imposed an excessive sentence. The Appellate Division affirmed, holding (1) that the trial court's *Sandoval* ruling was not an abuse of discretion, (2) that the claim regarding the circumstantial-evidence charge was unpreserved, and (3) that the sentence was not excessive. *See People v. Malavé*, 733 N.Y.S.2d 109 (2d Dep't 2001). Malavé applied for leave to appeal to the Court of Appeals, which was denied on February 28, 2002. *See People v. Malavé*, 97 N.Y.2d 731 (2002) (table).

    On June 17, 2002, Malavé moved the trial court, pursuant to New York Criminal Procedure Law § 440.10, to vacate the judgment of conviction on the grounds that he had been deprived of his right to the effective assistance of trial counsel and his right to a fair trial. Specifically, Malavé argued that trial counsel had (1) abandoned the motion to determine the voluntariness of his statement to the Lackhans, (2) failed to seek a bill of particulars, (3) failed to move for discovery, (4) failed to timely request a missing-witness charge as to Officer O'Hea, and (5) failed to request a circumstantial-evidence charge. The court denied the motion in its entirety. The basis for the denial is not entirely clear. On the one hand, the court cited New York Criminal Procedure Law § 440.10[2][c] for the proposition that "[a] motion to vacate a judgment of conviction must be denied if there are sufficient facts on the record to have allowed review of the issue on direct appeal but no

such appellate determination occurred because defendant unjustifiably failed to raise the issue on appeal," and concluded that "[t]he issues raised by [Malavé] relate to matters on the record which could have been raised on direct appeal, and decided by the Appellate Division." Decl. in Opp. to Pet., Ex. H at 2. On the other hand, the court found that Malavé "failed to sustain his burden of proving that he was denied the effective assistance of counsel" because he "submitted no . . . claims which would establish a lack of meaningful representation." *Id.* On January 6, 2003, the Appellate Division denied leave to appeal.

On January 14, 2003, Malavé petitioned the Appellate Division for a writ of error *coram nobis* and argued that he had received ineffective assistance of appellate counsel because appellate counsel had not raised on direct appeal the issues raised in his § 440.10 motion; in addition, he argued, for the first time, that appellate counsel should have raised on direct appeal trial counsel's failure to request an interested-witness instruction as to Mrs. Lackhan. In response, Erica Horwitz ("Horwitz"), the attorney who supervised Malavé's appellate counsel, submitted an affirmation defending the choice not to pursue those issues on direct appeal on the ground that trial counsel provided meaningful representation. With respect to Malavé's allegedly involuntary statement, Horwitz argued that the trial court had correctly held that the statement was not subject to the notice provision of § 710.30, and added, without further explanation, that failure to seek suppression under § 60.45 did not amount to ineffective assistance under state law; she also pointed out that trial counsel had requested and obtained a jury charge on the issue of voluntariness.

On September 15, 2003, the Appellate Division denied the *coram nobis*

7

petition. *See People v. Malavé*, 764 N.Y.S.2d 652 (2d Dep't 2003). Citing *Jones v. Barnes*, 463 U.S. 745 (1983), for the proposition that appellate counsel has no constitutional duty to raise "every 'colorable' claim suggested by a client," the Appellate Division summarily held that Malavé had "failed to establish that he was denied the effective assistance of appellate counsel." 764 N.Y.S.2d at 652. Leave to appeal was denied on December 23, 2003. *See People v. Malavé*, 1 N.Y.3d 575 (2003) (table).

## B. Federal *Habeas* Proceedings

In his *habeas* petition, which was timely filed, Malavé advanced three broad and somewhat overlapping claims. First, he claimed ineffective assistance of trial counsel, arguing that Miller "failed to investigate, failed to interview witnesses, failed to prepare for trial, abandoned a motion to suppress, failed to seek appropriate jury instructions, failed to object and thereby preserve issue[s] for appellate review, failed to seek discovery [and] failed to seek dismissal for gross prosecutorial misconduct." Pet. at 5. Second, he raised a stand-alone claim of "gross prosecutorial misconduct ." *Id.* Finally, he claimed that his appellate counsel's failure to raise the foregoing claims on direct appeal itself constituted ineffective assistance of counsel.

Prior to the evidentiary hearing, the Court held a status conference at which it explained that its principal concern was Miller's abandonment of the suppression motion; however, the Court did not limit the parties to that issue. *See* Tr. of Feb. 22, 2006, at 5 ("Mr. Markowitz, you are free to raise whatever it is that you may discern."), 11 ("Do whatever you have to do so we can go forward with the hearing . . .").

Only Miller and Malavé testified at the hearing. Miller testified that Malavé

initially told him that he did not wish to go to trial if he could get a plea deal of ten years or less. *See* HTr. at 43 ("And he told me, 'I don't want a trial. I don't want a hearing. Get me less than ten – give me ten or less, and you'll never see me again.'").[2] According to Miller, Malavé made this request "because [he] did it." *Id.* at 72. Shortly before trial, after plea negotiations had failed, Malavé told Miller that his statement to the Lackhans that he would return their property was made under duress, and insisted that Miller move to suppress the statement.

Miller testified that, although he made the motion to suppress, he believed that the motion "would have been denied out of hand, since the statement was not made to law enforcement[.]" *Id.* at 196. He further testified that he "did some research" after making the motion and concluded that making a motion to suppress under § 60.45 would waive the argument that the statement should be precluded because the notice required by § 710.30 had not been given. Thus, he withdrew the suppression motion and chose, instead, to move to preclude under § 710.30.

Malavé denied ever telling Miller that he was guilty and wished to take a plea. *See* HTr. at 115. He also denied taking the Lackhans' property and testified that it was only because he "was threatened to get my head blown off [sic]" that he had told the Lackhans that he would "get [their] stuff back." *Id.* at 152. At the state-court trial, by contrast, Malavé testified only that Mr. Lackhan had threatened him; despite the opportunity to do so, he never testified that he had told the Lackhans that he would return their property. *See* Tr. at 590 (testifying that immediately after the threat, he "grabbed the

---

[2]"HTr."refers to the transcript of the *habeas* hearing.

doorknob for the door, yanked it open, opened the other door and ran out of the house").

The appointment of counsel has proven salutary in focusing and fleshing out Malavé's claims. In his submission following the *habeas* hearing, Malavé's counsel concentrated on the claims that Miller abandoned a meritorious suppression motion, failed to request a "circumstantial evidence" jury charge, and failed to investigate and prepare for trial, as well as the claim that Malavé's appellate counsel provided ineffective assistance by failing to raise these claims on direct appeal. Notwithstanding the focus of counsel's submission, Malavé has not waived any of the claims raised in his initial petition. *See* Pet'r's Post-Hearing Mem. of Law at 16 n.13 ("In regard to the other claims raised by Petitioner in his petition for a writ of *habeas corpus*, the Petitioner expressly does *not* waive such claims. Instead he relies upon his previous *pro se* submissions.").

## II.

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which governs Malavé's petition, federal *habeas* review is generally restricted to claims addressed on the merits by a state court; relief may not be granted unless the state court's decision (1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); or (2) was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d)(2). If, instead of reaching the merits, the state court denies claims based on an "independent and adequate state procedural rule," "federal habeas review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged

violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

Some – but not all – of the claims raised in Malavé's petition were fairly presented in his § 440.10 motion and his *coram nobis* petition. In addition, the parties dispute whether the trial court's denial of Malavé's § 440.10 motion – which addressed both the merits and a state procedural rule – imposes a procedural bar to federal *habeas* review. *Compare Harris v. Reed*, 489 U.S. 255, 263 (1989) ("[A] procedural default does not bar consideration of a federal claim on . . . habeas review unless the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar."), *with id.* at 264 n.10 ("[A] state court need not fear reaching the merits of a federal claim in an *alternative* holding" because "the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law.").

The Court need not grapple with the issue of whether Malavé's claims of ineffective assistance of *trial* counsel are procedurally barred because he also claims that his *appellate* counsel's failure to raise those claims on direct appeal itself amounted to ineffective assistance; such a claim, if proven, might excuse the procedural bar to *habeas* review arguably imposed by the denial of his § 440.10 motion. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986) ("Ineffective assistance of counsel . . . is cause for a procedural default."). A claim of ineffective assistance of appellate counsel, however, must "be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default." *Id.* at 489. Although the Appellate Division unequivocally

denied Malavé's *coram nobis* petition on the merits, it is not possible to address whether that determination was contrary to, or an unreasonable application of, clearly established federal law without assessing Miller's performance: It would be unreasonable to conclude that Malavé's appellate counsel provided effective assistance if she did not raise a plainly meritorious claim.

Thus, the Court must reach the merits of Malavé's claims that Miller's performance was constitutionally defective. In so doing, the Court applies the familiar two-pronged test of *Strickland v. Washington*, 466 U.S. 668 (1984): First, Malavé must show that Miller's representation "fell below an objective standard of reasonableness," 466 U.S. at 688; in resolving this issue, a *habeas* court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. Second, Malavé must show prejudice, that is, "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," *id.* at 694; a reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.* "[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry [in order] or even to address both components of the inquiry if the defendant makes an insufficient showing on one." *Id.* at 697.

## A. Motion to Suppress

Malavé's principal ineffective-assistance claim – and the one that warranted the appointment of counsel and an evidentiary hearing – is based on Miller's abandonment of the motion to suppress Malavé's statement to the Lackhans as involuntary. There can be no question but that this claim satisfies the first prong of *Strickland*. At the *habeas*

hearing, Miller offered two reasons why he abandoned the motion. His first reason – that the motion would have been denied because the statement was not made to law enforcement – is unpersuasive in light of *People v. Grillo*, 574 N.Y.S.2d 583 (2d Dep't 1991), in which the Second Department held that the defendant in a burglary prosecution was entitled to a hearing on the issue of whether his statements at the scene of the crime were voluntary in light of his allegation that the statements "were made under duress after he had been physically beaten and threatened by the complaining witness and a relative." *Id.* at 584. The appellate court expressly rejected the trial court's rationale that a hearing was not required because "the alleged threats had been made by civilians and not by police officers." *Id.* Indeed, the commentary to § 60.45 clearly states that the statute "does not require participation of a public servant," and that the rule "has been in effect in New York for many years under the former Code of Criminal Procedure."

Miller's second rationale – that he would prejudice Malavé's rights, and perhaps even commit malpractice, if he did not withdraw the motion in favor of a motion to preclude under § 710.30 – fares no better. It is certainly true that, under New York law, "the notice requirement [of § 710.30] is excused when a defendant moves for suppression of the . . . testimony." *People v. Kirkland*, 89 N.Y.2d 903, 904 (1996). Here, however, § 710.30 – which requires notice only of statements given to "a public servant" – had no relevancy; it defies logic to suggest that an attorney could commit malpractice by waiving something his client was not entitled to in the first place.

In short, Miller abandoned a colorable argument in favor of a frivolous one. This decision was not based on a sound trial strategy, but rather on a simple

misunderstanding of state law; such decisions fall below an objective standard of reasonableness. *Cf. Flores,* 215 F.3d at 304 (*Strickland's* performance prong satisfied where "the only basis for this waiver [of *Rosario* claim] was counsel's misunderstanding of *Rosario*"). It would be an unreasonable application of *Strickland* to conclude otherwise.

The question then becomes whether Miller's error prejudiced Malavé. As applied here, *Strickland's* prejudice prong calls for a two-stage inquiry: (1) Was there a reasonable probability that the state trial court would have granted the motion to suppress had it been pursued? (2) Was there a reasonable probability that absent the allegedly involuntary statement, the state-court jury would have reached a different result?

The issue of prejudice is complicated by potentially dispositive questions regarding the effect of AEDPA deference and the burden of proof. Regarding AEDPA deference, if a state court had found that no threat was made, then the Court would have to defer to that finding unless Malavé established by clear and convincing evidence that it was incorrect. *See* 28 U.S.C. § 2254(e)(1) ("[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."). Malavé argues, however, that since no state court expressly made such a finding, the Court must decide the issue *de novo.* Respondent, by contrast, argues that by convicting Malavé, the state-court *jury* implicitly rejected his claim that his statement was involuntary, and that the Court must defer to that finding. Respondent further argues that, under *Sellan v. Kuhlman,* 261 F.3d 303 (2d Cir. 2001), AEDPA deference should apply even if the state court has not expressly articulated its rationale. *See id.* at 311 ("Nothing in the phrase

'adjudicated on the merits' requires the state court to have explained its reasoning process.").

The Court agrees with Malavé that no deference is due to the state-court jury's determination. The very point of a motion to suppress under § 60.45 is to remove a statement found to be involuntary from the jury's consideration. And while the Court agrees that a state court need not articulate its reasoning to trigger AEDPA deference, such deference extends "only to factual findings and mixed findings of fact and conclusions of law that [the *habeas* court] can fairly infer from the state court opinion." *Boyette v. LeFevre*, 246 F.3d 76, 80 (2d Cir. 2001). The Court cannot fairly infer a finding that Malavé's statement to the Lackhans was voluntary from any state-court decision. Thus, the Court must determine the issue of prejudice *de novo*. *Cf. id.* at 89 ("[B]ecause no state court determined whether some documents were *Brady* materials, we must exercise *de novo* review of this issue.").

The question of the burden of proof presents something of a conundrum: Had Miller pursued the suppression motion, the State would have borne the "heavy burden of proving [Malavé's] statements voluntary beyond a reasonable doubt." *People v. Holland*, 48 N.Y.2d 861, 862 (1979). Under conventional *habeas* jurisprudence, however, Malavé "must demonstrate by a preponderance of the evidence that his federal constitutional rights were violated." *Gaines v. Kelly*, 202 F.3d 598, 601 (2d Cir. 2000). Thus, by abandoning the motion, Miller effectively shifted the burden of proof onto Malavé.

This shift in the burden of proof may be problematic in certain cases. For example, if there were no evidence that Malavé's statement were voluntary, the

prosecution could not possibly have met its burden at a suppression hearing; in such a case, one might well ask why Malavé should shoulder the burden of proving that the statement was *involuntary* on *habeas* review simply because his counsel misunderstood the law.[3]

Here, however, the prosecution's position that Malavé's statement was voluntary was supported by the Lackhans' trial testimony that Mr. Lackhan never threatened him; although the Lackhans did not testify at the *habeas* hearing, their trial testimony is part of the record before this Court. *See Ventura v Meachum*, 957 F.2d 1048, 1057 n.5 (2d Cir. 1992) ("State court transcripts may be admitted as evidence in a federal habeas proceeding."). Thus, as both parties recognize, the voluntariness issue becomes one of credibility, with Malavé bearing the burden of proving, by a preponderance of the evidence, that his version of events is the correct one.

Based on an assessment of Malavé's credibility, the Court concludes that he has failed to meet his burden of proof. Although the Court's credibility determination is based on many factors, one deserves particular mention: After testifying at trial that Mr. Lackhan had threatened to "blow [his] fucking head off," Tr. at 588, Malavé was asked what happened; he testified that he "ran out of the house," *id.* at 590, without ever mentioning that Mr. Lackhan's threat had prompted him to tell the Lackhans that he would return their property. This omission at trial of a key element of his contention on

---

[3]Whether an outcome-determinative shift in the burden of proof due to counsel's ineffectiveness might itself constitute prejudice under *Strickland* is an intriguing question, but one that need not be answered in this case.

*habeas* bespeaks a lack of candor. [4]

## B. Jury Instructions

Malavé next argues that Miller provided ineffective assistance by failing to request (1) a jury charge regarding the wholly circumstantial nature of the prosecution's evidence on the burglary charge, and (2) a jury charge that the Lackhans were interested witnesses. In the same vein, he argues that Miller provided ineffective assistance by failing to *timely* request a "missing witness" charge to the effect that the jury could infer from the prosecution's failure to call Officer O'Hea as a witness that his testimony would have been favorable to Malavé.

As with the motion to suppress, *Strickland*'s prejudice prong requires Malavé to demonstrate (1) a reasonable probability that the jury instructions would have been given if requested (or, in the case of the "missing witness" charge, requested in a timely manner); and (2) a reasonable probability that the jury's verdict would have been different had the instructions been given. The Court concludes that Malavé has failed to make these showings.

With respect to the "circumstantial evidence" charge, the Court agrees with Malavé that the burglary charge was based solely on circumstantial evidence; however, Malavé's contention that this resulted in a heightened burden of proof is simply incorrect. *See People v. Barnes*, 50 N.Y.2d 375, 380 (1980) (dispelling the "misconception" that a wholly

---

[4]Since the Court concludes that Malavé has not met his burden of proving that his statement would have been suppressed had Miller pursued the issue, it need not reach the question of whether he has shown a reasonable probability that suppression of the statement would have changed the result at trial, a question that is not entirely free from doubt.

circumstantial case "imposes on the People a greater burden of proof than the traditional 'beyond a reasonable doubt' formulation"). Rather, as a matter of New York law, the lack of direct evidence would have entitled Malavé to an instruction that "it must appear that the inference of guilt is the only one that can fairly and reasonably be drawn from the facts, and that the evidence excludes beyond a reasonable doubt every reasonable hypothesis of innocence." *People v. Sanchez*, 61 N.Y.2d 1022, 1024 (1984). This is not substantially different from the instruction given by the trial court here: "The defendant is entitled to every inference in his favor which can reasonably be drawn from the evidence and where two inferences may be drawn from the evidence, one consistent with guilt and one consistent with nonguilt, the defendant is entitled to the inference of nonguilt." Tr. at 726. Any differences in the instruction given and the instruction to which Malavé was entitled simply did not create a reasonable probability that the jury's verdict would have been different had the latter instruction been given.

With respect to the "interested witness" charge, it is true that, as a matter of New York law, a charge that the defendant is an interested witness should normally be accompanied by a charge "indicat[ing] that the prosecution's witness may be interested." *People v. Suarez*, 509 N.Y.S.2d 75, 75 (2d Dep't 1986). The trial court's general instruction that "if [a witness is] interested in the outcome of the trial on one side or the other, you may consider such interest in determining how much credit or weight you will give their testimony," Tr. at 731, was sufficient to serve that purpose. No more specific charge was required unless there was evidence that a particular witness "had a direct penal or personal interest in the outcome of the case." *People v. Alvarado*, 528 N.Y.S.2d 148, 149 (2d Dep't

18

1998); *cf. People v. Panetta*, 673 N.Y.S.2d 434, 437 (2d Dep't 1998) (requiring specific instruction where complaining witness had brought civil suit based on same conduct); *People v. Brabham*, 430 N.Y.S.2d 123, 125 (2d Dep't 1980) (requiring specific instruction where witnesses faced criminal liability). Even assuming that a more specific charge was called for under New York law, there is no reasonable probability that such a charge would have changed the outcome of the case.

Finally, with respect to the "missing witness" charge, such a charge need not be given if, among other reasons, "the testimony from the missing witness would be merely cumulative to other evidence." *People v. Keen*, 94 N.Y.2d 533, 539 (2000). Here, Malavé contends that Officer O'Hea could have been used to impeach Mrs. Lackhan's testimony regarding her 911 call reporting the burglary. Mrs. Lackhan, however, frankly admitted on cross-examination that she had told the 911 operator that the burglar had entered through a window, but that she had told the responding officer (O'Hea) that "someone had kicked in or broken into the doors and damaged them." Tr. at 440. Officer O'Hea's testimony, therefore, would have served only to corroborate what Mrs. Lackhan had already admitted.

## C. Prosecutorial Misconduct

Malavé next argues that Miller provided ineffective assistance by failing to object to "gross prosecutorial misconduct," i.e., the introduction of allegedly perjured testimony. It is, of course, a violation of due process for a prosecutor to knowingly introduce perjured testimony at trial. *See Su v. Filion*, 335 F.3d 119 (2d Cir. 2003) (citing *Napue v. Illinois*, 360 U.S. 264 (1959)). To make out such a violation, however, the

petitioner must first show that perjury was, in fact, committed. *See United States v. Torres*, 128 F.3d 38, 49 (2d Cir. 1997). "A witness commits perjury if he gives false testimony concerning a material matter with the willful intent to provide false testimony, as distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory," *United States v. Monteleone*, 257 F.3d 210, 219 (2d Cir. 2001); thus, "[s]imple inaccuracies or inconsistencies in testimony do not rise to the level of perjury." *Id.*

Apart from conclusory allegations, Malavé's claim of perjury is based on two aspects of Mrs. Lackhan's trial testimony. First, Mrs. Lackhan testified that when Malavé first moved in, he told her his name was "Anthony Malone." Tr. at 359. Malavé has not even established that this statement was false; that Mrs. Lackhan referred to Malavé as "Anthony Malavé" before the Grand Jury and at trial establishes only that she eventually learned his correct name. There is, moreover, no dispute that, whatever his name, Malavé was the person who rented a room from the Lackhans.

Second, Mrs. Lackhan testified that the lock on her apartment door had been broken during the burglary. Although she originally told a 911 operator that the burglar had entered through a window, she explained at trial that she had not noticed the broken lock when she made the 911 call, and had made an assumption about the method of entry from the fact that the apartment windows were open. This explanation resolves any perceived inconsistency between her two statements. Similarly, Malavé has failed to establish that any inconsistency between Mrs. Lackhan's testimony and Officer Agro's testimony that he observed no signs of forced entry was anything more than the result of "confusion, mistake, or faulty memory." *Monteleone*, 257 F.3d at 219.

In short, Malavé has not established that Mrs. Lackhan committed perjury, let alone that the prosecutor knowingly allowed perjured testimony to be introduced into evidence. There was, therefore, no "gross prosecutorial misconduct." Miller's failure to object to non-existent prosecutorial misconduct obviously does not amount to ineffective assistance.

## D. Failure to Investigate/Prepare

"[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Malavé contends that Miller failed in this duty by failing to interview potentially favorable witnesses. In particular, Malavé argues (1) that other residents – Earl Hines and Stephen Lowe – witnessed his confrontation with the Lackhans and would have corroborated his version of events, and (2) that Malavé's co-workers would have corroborated his claim that the jewelry he was reprimanded for selling was not stolen.

As Malavé points out, Miller's testimony at the *habeas* hearing as to whether and when he learned the identity and location of these potential witnesses was contradictory and, at times, evasive; however, Miller credibly testified that Malavé told him that the other residents would have only "negative things to say about him." HTr. at 60. Given this information from his client, Miller's decision not to pursue the matter was reasonable. In addition, the Court concludes that without anything more than bald assertions that the potential witnesses would have testified favorably, Malavé cannot establish prejudice. It is just as likely, for example, that Hines and Lowe would have corroborated the Lackhans' version of events as Malavé's.

21

Apart from alleging that Miller failed to interview witnesses, Malavé makes the blanket assertion that Miller also failed to adequately prepare for trial. The record reflects, however, that Miller requested and obtained a *Rodriguez* hearing (requiring the prosecutor to prove that the Lackhans knew Malavé well enough to make a pretrial identification) and a *Sandoval* hearing (limiting the prosecutor's use of Malavé's prior convictions). He also requested *Rosario* material and other documents from the prosecutor. Finally, he effectively cross-examined the State's witnesses, drawing out inconsistencies in the description of the condition of the Lackhans' apartment after the burglary and the burglar's method of entry. Under the circumstances, Miller's preparation fell "within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

### III

For the foregoing reasons, Malavé's petition is denied in its entirety. Because Malavé has failed to make a substantial showing of the denial of a federal right, a certificate of appealability will not issue. *See* 28 U.S.C. § 2253.

**SO ORDERED**.

s/FB

FREDERIC BLOCK
United States District Judge

Brooklyn, New York
June ___, 2008